**<u>PUBLISHED</u>**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-7044**

THOMAS ALEXANDER PORTER; ANTHONY BERNARD JUNIPER; MARK LAWLOR; RICKY JOVAN GRAY,

        Plaintiffs – Appellants,

    and

IVAN TELEGUZ,

        Plaintiff,

      v.

HAROLD W. CLARKE; DAVID ZOOK,

        Defendants – Appellees.

---------------------------------------

THE AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, INC.; THE RUTHERFORD INSTITUTE,

        Amici Supporting Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:14−cv−01588−LMB−IDD)

Argued: January 25, 2017                    Decided: March 24, 2017

Before NIEMEYER, TRAXLER, and WYNN, Circuit Judges.

Reversed and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Traxler joined.

**ARGUED:** Kathryn Marshall Ali, HOGAN LOVELLS US LLP, Washington, D.C.; Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellants.  Margaret Hoehl O'Shea, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:** Elizabeth C. Lockwood, W. David Maxwell, Ryan Stephenson, Washington, D.C., Parker D. Thomson, HOGAN LOVELLS US LLP, Miami, Florida; Steven D. Rosenfield, Jeffrey E. Fogel, Charlottesville, Virginia, for Appellants.  Mark R. Herring, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  David W. DeBruin, Carrie F. Apfel, Kelly M. Morrison, Washington, D.C., Jeffrey A. Atteberry, JENNER & BLOCK, LLP, Los Angeles, California, for Amici The American Civil Liberties Union Foundation of Virginia, Inc. and The Rutherford Institute.  Hope R. Amezquita, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, INC., Richmond, Virginia, for Amicus The American Civil Liberties Union Foundation of Virginia, Inc.  John W. Whitehead, Doug R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia, for Amicus The Rutherford Institute.

WYNN, Circuit Judge:

Plaintiffs Thomas Porter, Anthony Juniper, and Mark Lawlor[1] (collectively, "Plaintiffs")—three inmates on Virginia's death row—alleged that their conditions of confinement amounted to cruel and unusual punishment in violation of the Eighth Amendment. After Plaintiffs filed their complaint, Defendants Harold Clarke, Director of the Virginia Department of Corrections ("Director Clarke"), and Darren Zook, Warden of Sussex I State Prison ("Warden Zook," and collectively with Director Clarke, "Defendants"), substantially changed the policies governing the conditions of confinement for inmates on Virginia's death row, addressing virtually all of the issues raised in Plaintiffs' complaint. The district court concluded that Defendants' changes to the challenged policies mooted Plaintiffs' action.

But as Plaintiffs contend, Defendants' voluntary cessation of the challenged practice has not yet mooted this action because Defendants failed to meet the Supreme Court's requirement of showing that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Indeed, Defendants repeatedly have refused to rule out a return to the challenged policies. Accordingly, we must agree with Plaintiffs that the district court erred in dismissing Plaintiffs' action as moot.

---

[1] Ricky Jovan Gray, another plaintiff involved in this appeal, was executed by the State of Virginia on January 18, 2017, rendering his appeal moot.

I.

On November 20, 2014, the date Plaintiffs filed their complaint, two Corrections Department policies governed the conditions of confinement for inmates on Virginia's death row: Local Operating Procedure 460.A, entitled "Security of Offenders Under the Sentence of Death," effective March 1, 2010, and "Institutional Rules and Regulations for Offenders – Death Row," effective February 3, 2010. J.A. 709. Under the two policies, Plaintiffs, as death row inmates, "spen[t] almost all of [their] time alone"— approximately twenty-three hours per day—in seventy-one-square-foot prison cells furnished with only a steel bed, a small desk, and a single fixture that doubled as a commode and a sink. J.A. 20. The policies required separation of each Plaintiff from other death row inmates by at least one cell. Although the Corrections Department's policies permitted Plaintiffs to receive visitors, visitation opportunities were limited to non-contact visits, with Plaintiffs and their visitors separated at all times by a plexiglass partition. Death row inmates could request contact visitation with immediate family members only under unspecified "extreme circumstances," with the warden maintaining unconstrained discretion to grant or deny such requests. *Porter v. Clarke*, No. 1:14–cv–1588, 2016 WL 3766301, at *4 (E.D. Va. July 8, 2016) (quoting Local Operating Procedure 460.A); *see also* J.A. 915.

The policies further barred Plaintiffs from "join[ing] general population inmates for vocational, educational, or behavioral programming, []or . . . attend[ing] group religious services." J.A. 21. Also unlike the general prison population, Plaintiffs were "not allowed to use the gymnasium or prison yard, nor [were they] given an opportunity

4

for [indoor] recreation." J.A. 20. And although Corrections Department policy allowed Plaintiffs one hour of outdoor recreation approximately five days a week, Plaintiffs were limited to exercising in an outdoor cell—similar in size to their indoor cells—with a concrete floor and no exercise equipment.

On August 6, 2015, nearly a year after Plaintiffs filed their complaint, Warden Zook approved interim rules and regulations relaxing the conditions of confinement for inmates on death row. The interim rules and regulations allowed Plaintiffs: (1) 1.5 hours of contact visitation with immediate family members, once a week; (2) 1.5 hours of non-contact visitation with approved visitors on weekends and holidays; (3) a minimum of 1.5 hours of outdoor recreation, five days per week; (4) at least one hour of indoor recreation with up to three other inmates, daily; and (5) a fifteen-minute shower, daily. The Corrections Department also constructed a new outdoor recreation yard for death row inmates to allow for unrestrained, outdoor group recreation, as well as a multipurpose dayroom to allow death row inmates to engage in indoor group recreation activities and religious services, behavioral programming, and employment opportunities. The Corrections Department spent approximately $2 million planning, designing, and constructing the new facilities.

Following Warden Zook's approval of the interim rules and regulations, Defendants moved to stay proceedings in the district court for ninety days pending implementation of the interim rules and regulations and to refer any remaining disagreements to a magistrate judge for mediation. The district court granted the unopposed motion on August 12, 2015. On November 13, 2015, after partial

implementation of the interim rules and regulations, the parties filed a joint status report informing the court that they had participated in settlement proceedings but were ultimately unable to resolve the action.

On December 21, 2015, Plaintiffs and Defendants filed cross-motions for summary judgment. Defendants' motion did not argue that the change in policies warranted or required dismissal of Plaintiffs' action as moot. On the contrary, Defendants stated that they were not seeking "outright dismissal on the grounds of mootness" because of the "heavy burden" a defendant must satisfy to demonstrate that its voluntary cessation of a challenged policy rendered an action contesting that policy moot. J.A. 1082–83; *see also Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014).

Nevertheless, during a hearing on the motions on January 29, 2016, the district court observed that "it looks as though most of the issues [in the case] have been essentially resolved." J.A. 1158. Plaintiffs responded that they were not challenging their conditions of confinement under the interim rules and regulations, "so the only challenge that's before the Court relates to the conditions prior to the implementation of the August 2015 interim regulations." J.A. 1158–59. To that end, Plaintiffs represented that they were seeking "an injunction that would require [Defendants] to essentially keep these improvements in place unless there is a specific reason as to a particular inmate or . . . an institutional reason why they couldn't stay in place," as well as a declaration that the conditions on death row prior to the August 2015 policy changes constituted cruel and unusual punishment in violation of the Eighth Amendment. J.A. 1159.

The court then asked the parties why, given the policy changes, they had been unable to agree to a consent decree that would ensure the policy changes remained in place going forward. Plaintiffs informed the court that the parties had failed to come to an agreement because Plaintiffs had not "received . . . reasonable assurances that any of [the revised policies] will remain in place" and that, even if the policies were kept "in place, . . . there's no guarantee that those policies will be followed in practice, and . . . there's nothing stopping the government from revoking those policies immediately." J.A. 1160–61. Defendants concurred with Plaintiffs' explanation as to why the parties had not been able to reach an agreement, stating that the Corrections Department "didn't want anything in place that would necessarily bind [them] to act in one manner or another." J.A. 1162. Defendants' counsel further explained:

> I don't think the [Corrections Department] has any intent whatsoever to go back to the way things were, but the department can't be blind to the fact that things might change in the future. If there's an attempted escape next month, the department might need to temporarily go back on lockdown status so that they could assess why that happened and fix the circumstances, and having the consent decree in place would hamper their ability to go and make these security considerations.

J.A. 1164–65.

On May 20, 2016, the district court ordered Defendants to "provide an update as to the status of the regulations on death row, specifically explaining whether the interim regulations have been finalized." J.A. 1196. Two weeks later, on June 3, 2016, Defendants filed an affidavit from Warden Zook affirming that a new operating procedure had been signed into effect on June 2, 2016, replacing former Local Operating Procedure 460.A and the August 2015 interim rules and regulations previously in effect.

7

Under the new policy, Operating Procedure 425.A, death row inmates are afforded: (1) at least 1.5 hours of outdoor recreation, five days per week; (2) at least one hour of indoor recreation in groups of up to four inmates, daily; (3) showers for a maximum of fifteen minutes; (4) 1.5 hours of contact visitation with immediate family members and one approved non-family member, once a week; (5) non-contact visitation on weekends and holidays; and (6) the opportunity to request extended visitation periods, to be granted by the assistant warden on a case-by-case basis. Operating Procedure 425.A also requires the Corrections Department to review the policy annually and rewrite it no later than three years after the effective date.

On July 8, 2016, the district court issued a memorandum opinion holding that "the improvements voluntarily made by defendants have rendered plaintiffs' claims moot." *Porter*, 2016 WL 3766301, at *11. In reaching this conclusion, the district court found that "defendants here decline to explicitly acknowledge that the pre-2015 conditions of confinement were unconstitutional or to offer explicit guarantees that the [Corrections Department] will not return to those conditions," *id.* at *9, but nonetheless concluded that the challenged practices "'could not reasonably be expected to recur'" in light of Defendants' "policy and procedural changes[ as well as] physical changes to the death row facilities," *see id.* (quoting *Wall*, 741 F.3d at 497). In an accompanying order, the court granted Defendants' motion for summary judgment, denied Plaintiffs' summary judgment motion as moot, and entered judgment in favor of Defendants. Plaintiffs timely appealed.

II.

The principal question on appeal is whether the district court erred in holding that the changes to Plaintiffs' conditions of confinement resulting from the revisions to the Corrections Department's policies rendered Plaintiffs' action moot.[2] When, as here, the relevant jurisdictional facts are not in dispute, we review a district court's dismissal based on mootness de novo. *See S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *Stein v. Buccaneers Ltd.*, 772 F.3d 698, 701 (11th Cir. 2014) ("We review de novo the legal issue of whether, based on the facts, a case is moot. Here the facts are undisputed, so our review of the only matter at issue— the legal effect of the undisputed facts—is de novo.")

"[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)), which extends only to actual cases or controversies, U.S. Const. art. III, § 2. When a case or controversy ceases to exist— either due to a change in the facts or the law—"the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League*, 789

---

[2] On appeal, Plaintiffs also argue that the district court's failure to notify the parties that it was intending to decide the case on mootness grounds *sua sponte* violated Federal Rule of Civil Procedure 56(f)(2), which states that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant [a summary judgment] motion on grounds not raised by a party." Because we conclude that the district court erred in dismissing the action as moot, we need not—and thus do not—decide whether the district court violated Rule 56(f).

F.3d at 482. Put differently, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980))).

The district court concluded that the Corrections Department's revisions to the policies governing the conditions of confinement of death row inmates rendered Plaintiffs' claim moot because the revisions addressed all of the issues raised in Plaintiffs' complaint. *Porter*, 2016 WL 3766301, at *8. There is, however, a well-recognized exception to the mootness doctrine holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.").

The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). Accordingly, the exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a

10

dismissal and then reinstating it immediately after." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013) (citing *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). To that end, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190.[3]

The Supreme Court has held that a defendant satisfies this heavy burden when, for example, it enters into an "unconditional and irrevocable" agreement that prohibits it from returning to the challenged conduct. *Already, LLC*, 133 S. Ct. at 728. Likewise, we have held that a governmental entity's change of policy renders a challenge moot when

---

[3] A voluntary cessation of challenged conduct must be "at least somewhat related" to the pending litigation for the voluntary cessation exception to apply. *Wall*, 741 F.3d at 498 n.8. Defendants contend that the exception does not apply here because the district court found that the changes to the challenged policies "were contemplated prior to the initiation of litigation," and that finding was not clearly erroneous. Appellees' Br. at 29. We do not agree that the district court engaged in any such factfinding, and in any event, the record was not sufficient to support a determination that the exception did not apply. Most critically, regardless of when the policy changes were first considered, the changes were made only after this case was initiated and they came after Defendants' vigorous resistance to changes for several years. Additionally, the interim rules and regulations that effected a repeal of the challenged policies were promulgated only after this suit was initiated and the district court denied Defendants' motion to dismiss. And the interim rules and regulations were not made final until after the district court ordered a status update regarding whether the rules and regulations had been finalized.

11

the governmental entity "has not asserted its right to enforce [the challenged policy] at any future time." *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989). In the context of conditions of confinement cases, in particular, courts have found that a change that "completely and irrevocably eradicate[s] the effects" of the condition or policy subject to challenge renders an action moot. *Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 854 (9th Cir. 1985) (internal quotation marks omitted) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (finding challenge to adequacy of prison library mooted by replacement of library with larger facility); *see also Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007) (holding that transfer of plaintiff inmate from unit or location where he is subject to challenged policy to unit or location where he cannot be subject to challenged policy renders challenge to policy to moot).

By contrast, a defendant fails to meet its heavy burden to establish that its allegedly wrongful behavior will not recur when the defendant "retains the authority and capacity to repeat an alleged harm." *Wall*, 741 F.3d at 497; *see also Pashby v. Delia*, 709 F.3d 307, 316–17 (4th Cir. 2013) (holding that a governmental entity's change to a challenged policy does not moot an action when the government retains authority to "reassess . . . at any time" the change and revert to the challenged policy). And courts have been particularly unwilling to find that a defendant has met its heavy burden to establish that its allegedly wrongful conduct will not recur when the defendant expressly states that, notwithstanding its abandonment of a challenged policy, it could return to the contested policy in the future, *see Town of Nags Head v. Toloczko*, 728 F.3d 391, 394 n.3 (4th Cir. 2013), or when the defendant's "reluctant" decision to change a policy reflects

12

"a desire to return to the old ways," *Citizen Center v. Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) (internal quotation marks omitted) (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010)). In the context of litigation regarding the policies governing prisoners' conditions of confinement, in particular, courts have refused to find a challenge to an abandoned policy or practice moot when the prison refuses either to "promise[] not to resume the prior practice," *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013) (internal quotation marks omitted) (quoting *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833–34 (11th Cir. 1989)), or to otherwise "unambiguously terminate[]" the challenged practice, *Doe v. Wooten*, 747 F.3d 1317, 1324 (11th Cir. 2014).

Here, nothing bars the Corrections Department from reverting to the challenged policies in the future. And given Operating Procedure 425.A's requirement that the Corrections Department review the policy governing Plaintiffs' conditions of confinement annually and rewrite that policy no later than three years after the current policy's effective date, it is more than a "mere possibility" that Defendants will alter Plaintiffs' current conditions of confinement. *W.T. Grant*, 345 U.S. at 633; *see also Wall*, 741 F.3d at 497 (finding change in policy did not moot action when there was "some degree of doubt that the new policy will remain in place for long").

More significantly, throughout the course of this litigation, Defendants have refused to commit to keep the revised policies in place and not revert to the challenged practices. On the contrary, as the district court found, Defendants repeatedly have "decline[d] to explicitly acknowledge that the pre-2015 conditions of confinement were

13

unconstitutional or to offer explicit guarantees that the [Corrections Department] will not return to those conditions." *Porter*, 2016 WL 3766301, at *9; *see also*, *e.g.*, J.A. 1162 (stating that Corrections Department refused to agree to consent decree keeping revised policies in place because it "didn't want anything in place that would necessarily bind [it] to act in one manner or another"); J.A. 1164–65 ("[T]he [Corrections Department does not] ha[ve] any intent whatsoever to go back to the way things were, but the department can't be blind to the fact that things might change in the future."). Indeed, during oral argument, Defendants' counsel said the Corrections Department could not foreswear a return to the challenged policies because it "doesn't have a crystal ball that will enable [it] to know what might happen on death row ten years from now. . . . If the director had stood up and sworn that we were never going to go back, period, I don't think that is a statement that he could make without making a misrepresentation to the court." Oral Arg. 24:27–57.

We do not question the Corrections Department's penological rationale for refusing to guarantee that it will not revert to the challenged policies if conditions so require. But given that the Corrections Department (1) "retains the authority and capacity" to return to the challenged policies, *Wall*, 741 F.3d at 497, (2) refuses to "promise[] not to resume the prior practice," *Rich*, 716 F.3d at 532 (internal quotation marks omitted) (quoting *Jager*, 862 F.2d at 833–34), and (3) has suggested circumstances may require re-imposing the challenged policies, Defendants cannot meet their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Laidlaw*, 528 U.S. at 190. Indeed, the facts

14

of the present case closely track those in *Wall*, in which we found that the Corrections Department's revision of a challenged policy after the initiation of litigation did not moot the case when: the Corrections Department failed to establish that it would not reinstate the policy following completion of the lawsuit; the Corrections Department did not suggest it was barred or considered itself barred from reinstating the policy if it so chose; and there was "some degree of doubt that the new policy w[ould] remain in place for long." 741 F.3d at 497. Accordingly, the district court erred in dismissing Plaintiffs' action as moot.[4]

---

[4] Defendants argue that "this case also fails for lack of an effective remedy." Appellees' Br. at 27; *see* 18 U.S.C. § 3626(a)(1)(A) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."); *see also id.* § 3626(g)(7) (defining "the term 'prospective relief' [to] mean[] all relief other than compensatory monetary damages"). This argument also underlies Defendants' contention that Plaintiffs' claims should be dismissed under the doctrine of prudential mootness. The district court, however, did not address the merits of Plaintiffs' claims for declaratory and injunctive relief, *see Porter*, 2016 WL 3766301, at *11 (noting that, because it concluded the case was moot, "it would be inappropriate . . . to invoke the injunction authority of the Court"), and therefore we decline to do so now, *see Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007) ("[L]ike the district court, we have decided *only* the mootness question; we offer no opinion on the merits of [the plaintiff's] claims for declaratory and injunctive relief."). If Defendants so request, the district court can address Plaintiffs' entitlement to declaratory and injunctive relief on remand. *See Sheely*, 505 F.3d at 1182 n.10 ("Even though a case is not moot, that does not mean that injunctive relief follows automatically . . . . Therefore, nothing in this opinion should be read to preclude the district court on remand, and after appropriate review, from deciding that equitable relief is not warranted." (citation omitted)); *Carreras v. City of Anaheim*, 768 F.2d 1039, 1047 n.19 (9th Cir. 1985), *abrogated on other grounds by L.A. Alliance for Survival v. City of Los Angeles*, 993 P.2d 334, 350 (2000) ("On remand in this case, the city may attempt to show that the likelihood of its
(Continued)

III.

For the reasons stated herein, the judgment of the district court is

*REVERSED AND REMANDED.*

---

engaging in similar constitutional violations is sufficiently remote to make injunctive relief unnecessary."). For the same reason, we also decline to find Plaintiffs' action equitably moot.